[No. C002621. Third Dist. Sept. 20, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD ALLEN SMALL, Defendant and Appellant.

[Opinion certified for partial publication.*]

---

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II-IV.

**COUNSEL**

Abby Pruitt, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Shirley A. Nelson and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EVANS, Acting P. J.**—A jury found defendant, Richard Small, guilty of manufacturing methamphetamine (Health & Saf. Code, § 11379.6, subd. (a)) (count I), possession of methylamine and phenyl-2-propanone (P-2-P) with the intent to manufacture methamphetamine (Health & Saf. Code, § 11383, subd. (a)) (count II), and possession of methamphetamine (Health & Saf. Code, § 11377) (count III). Defendant was found not guilty of a fourth count, possession of methamphetamine for sale (Health & Saf. Code, § 11378) (count IV). Presumptively ineligible for probation because of his conviction of manufacturing methamphetamine (see Pen. Code, § 1203.073, subd. (b) (3)), and the sentencing court finding no unusual circumstances justifying a grant of probation, defendant was sentenced on count I to the upper term of seven years in state prison. The court further imposed upper-term sentences of three years each on counts II and III, execution of which was stayed pursuant to Penal Code section 654. Defendant appeals, contending (1) the evidence was insufficient to sustain the convictions on counts I and II, (2) certain evidence was the product of an illegal search and seizure, and trial counsel provided ineffective assistance in failing to move to suppress that evidence, (3) the giving of CALJIC No. 2.21 (witness willfully false) impermissibly altered the People's burden of proof, and (4) prior trial counsel was permitted to withdraw in defendant's absence, prejudicially denying defendant his right to be present and to have counsel. We fail to find any merit in defendant's contentions and shall affirm the judgment.

## FACTS

Around 8:00 or 8:30 on the evening of May 23, 1986, after having gone out to dinner and to visit friends, Laurel McCartney and his wife returned to their Oroville home at 1936 Jefferson Street. Mr. McCartney detected a strong, pungent odor permeating the area, and saw smoke in the air. He traced the source to a house at 1944 Jefferson, which he knew to be occupied by one Robin Tinjaca. Mr. McCartney saw smoke coming from the house's back door and, upon closer examination, observed tubing and wires hanging inside. He went home and called the Butte County Sheriff's office.

Sheriff Sergeant James Nylander responded to McCartney's call. Nylander then summoned Sheriff Deputy Larry Estes, who was a detective assigned to the Butte Interagency Narcotics Task Force. The sheriff's department in turn summoned Department of Justice Special Agent Mitch Brown, who was the commander of the task force. Brown and Estes arrived at the location about 9:40 p.m. Brown immediately detected an odor he associated with the manufacture of methamphetamine and/or P-2-P, and,

in his experience, fumes of this type were toxic and explosive. His observations confirmed his suspicion; Brown then summoned fire department personnel and asked Sergeant Nylander to quickly gather as many deputies as possible. Upon their arrival, fire and sheriff's department personnel evacuated the neighborhood, and preparations were made to "assault" and secure the suspect house.

About 11:30 p.m., five officers, including Agent Brown, surrounded the house and entered it from the front and rear. Inside the laundry area, at the back of the house, Brown observed two large flasks sitting in heating mantles. The flasks contained bubbling, goldish-colored liquid, and attached atop the flasks were condenser tubes. Brown further observed numerous cans of assorted chemicals and sundry glassware in both the laundry and the kitchen areas. The fumes were particularly strong inside the house, and, based upon his experience, Brown believed that P-2-P was being manufactured at that very moment. All the occupants of the house at that time — Donald Keith, Greg Bailey, and Deana Mortensen—were arrested, and the house was evacuated. Brown neutralized the chemical reaction that was in progress and then left to obtain a search warrant.

Detective Estes was assigned to maintain security at the house and keep onlookers away while the premises were held secure pending Brown's return. About 3 a.m., a car entered the area, approached the house, and stopped in front. Driving the car was Thomas Bryson; defendant was his passenger. Estes approached the vehicle to ascertain the reason for the occupants' presence and who the occupants were. He asked defendant to identify himself and why he was present. Defendant identified himself and told Estes he was there to visit a "female companion" on the sly. Estes recognized defendant's name as the subject of an outstanding traffic warrant, and, after receiving radio confirmation of defendant's status, arrested him. An ensuing search uncovered two bindles of methamphetamine in defendant's pocket. The weight of the methamphetamine, including its packaging, was 3.9 grams. Estes then shined his flashlight toward the inside of the car, on the front seat of which he observed an open tote bag. Inside the bag appeared to be a white substance. Suspecting methamphetamine, Estes asked Bryson for consent to search the vehicle. Bryson balked, but Estes insisted on searching, and then did search the tote bag. Inside the bag were several damp coffee filters that contained a strong odor and residue of methamphetamine. In addition, there was a large plastic baggie containing 9.6 grams of methamphetamine, as well as three Vitablend bottles containing a total of 45.4 grams of methamphetamine. On the basis of the items found in the tote bag, Bryson was arrested for possession of methamphetamine.

Robin Tinjaca arrived at the house about 6 a.m. and was arrested.

At 6:40 a.m., Agent Brown returned with a search warrant for the house. Pursuant to the search, Department of Justice Special Agent Dan Largent seized various items of laboratory equipment and containers of chemicals. According to Largent, the setup he observed in the house was consistent with the manufacture of P-2-P. P-2-P is a precursor to methamphetamine, and, in the ordinary illegal lab, the manufacture of methamphetamine is the next step. The P-2-P is combined with another precursor, methylamine, to make the methamphetamine. Isopropyl alcohol, aluminum and mercuric chloride are added to assist the chemical reaction. The process takes about 40 to 48 hours—28 hours to make the P-2-P, and 8 to 12 hours to make the methamphetamine. Acetone is commonly used to help crystallize the methamphetamine and to flush out impurities. This purification is accomplished by placing the methamphetamine into coffee filters and spreading acetone over the top. The methamphetamine is then commonly "cut" with either powdered sugar or Vitablend.

Forensic chemist Gary Sorgen analyzed the chemicals seized by Agent Largent. He found them to include isopropyl alcohol, sodium acetate, hydrochloric acid, acetic acid, methylamine, phenylacetic acid, mercuric chloride, sodium hydroxide, and 1, 3-diphenyl, 2-methylaminopropane. Sorgen also detected methamphetamine residue in a number of coffee filters seized from the house. Although he found no P-2-P among the chemicals seized, those he analyzed were precursors and catalysts in the manufacture of P-2-P. In Sorgen's opinion, there was "[n]o chance whatsoever" that these chemicals and the apparatus in the house were being used for any purpose other than to manufacture P-2-P and methamphetamine.

Latent print analyst Nancy Masters lifted fingerprints from the items seized at the house. She found sixteen of defendant's fingerprints among three cans of acetone, one can of isopropyl alcohol, a reaction flask, and a glass tube.

Defendant admitted he was a regular user of methamphetamine, consuming a quarter to a half a gram per day, and he conceded his possession, for personal use, of the methamphetamine found in his pocket. He knew that Greg Bailey manufactured methamphetamine, but he denied any involvement in the illegal lab. The methamphetamine in his pocket was the remainder of a quarter ounce of the drug purchased a week earlier from Bailey at another address. At the time of the purchase, Bailey had asked defendant to help him move some things out of his way. Defendant obliged, moving some cans of acetone and miscellaneous glass items in boxes. On May 23, 1986, defendant and Bryson spent the day visiting several people, with Bryson

providing the transportation. At no time before 3 a.m. on May 24 was defendant at 1944 Jefferson Street. Defendant testified he knew 1944 Jefferson only as a place to find women, and he had gone there that night to spend some time with Deana Mortensen, not to see Bailey. In fact, defendant said, he did not associate Bailey with that address. Defendant said he saw the tote bag on the front seat of Bryson's car, but he did not see or smell its contents, nor was it discussed. Defendant said that, as it was not his bag, he considered it none of his business and would not get into it.

DISCUSSION

I

■ Defendant contends the evidence was insufficient to sustain his convictions for manufacturing methamphetamine and for possessing P-2-P and methylamine with the intent to manufacture methamphetamine (counts I and II). ■ Accordingly, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) "Substantial evidence must be more than evidence which merely raises a strong suspicion of guilt as mere suspicion will not support an inference of fact." (*People* v. *Martin* (1973) 9 Cal.3d 687, 695 [108 Cal.Rptr. 809, 511 P.2d 1161].) Applying this standard of review, we conclude defendant's evidentiary contention misses the mark.

■ The People's case against defendant on counts I and II was entirely circumstantial and primarily consisted of defendant's presence at the site of the clandestine laboratory at 3 a.m., his personal possession and use of methamphetamine, the large plastic baggie and three Vitablend bottles of methamphetamine and several damp coffee filters emitting a strong odor of methamphetamine found in the tote bag between defendant and Bryson, as well as defendant's fingerprints taken from a number of containers and drug manufacturing paraphernalia in the laboratory.

Evidence was also presented by the drug agents that coffee filter papers were commonly used by clandestine laboratories to cleanse the methamphetamine of impurities which left methamphetamine residue in the filters, and the filters were sold on the street to users, generally younger users, for about $1 or $1.50.

Defendant asserts the contraband in the tote bag cannot be considered a circumstance supporting defendant's convictions on counts I and II. He is

wrong. This evidence was the basis for count IV, which charged defendant with possession of methamphetamine for sale, and on which the jury found defendant not guilty. The People assert the jury's verdict on count IV did not necessarily negate defendant's possession and dominion and control of the contraband; we agree. The jury may have found only that defendant did not possess the methamphetamine with the intent to sell it. The substantial evidence rule is generous to the respondent on appeal and permits a trier of fact to draw reasonable inferences from the evidence. The People presented evidence that the street value of "cut" methamphetamine was about $1,000 an ounce. The methamphetamine found in the plastic baggie and in the Vitablend bottles was "cut" and weighed a total of 55 grams. With one gram equal to 0.035 ounce, this amounted to almost two ounces, or $2,000's worth of methamphetamine. The People also presented evidence that the coffee filters used in the manufacture of methamphetamine are commonly sold on the street for a dollar or two to teenagers who then chew the filters for the drug residue. Detective Estes testified that, based on his experience, "the sheer amount" of the methamphetamine in the tote bag, combined with its packaging and the accompanying paraphernalia, could only mean that the drug was intended for distribution and sale. On the record as a whole, we believe the jury found defendant did not possess the 55 grams of methamphetamine for sale, but rather, that defendant was one of the manufacturers of the methamphetamine and was delivering it to Bryson who was the dealer. Although the tote bag was not defendant's and was not in defendant's car, it was situated between defendant and Bryson and was open and its contents apparent. The jury could reasonably draw the inference from those circumstances that defendant knew of the contents of the bag, was aware of its contraband nature, and was in fact in the process of delivering the contraband to Bryson for purpose of sale.

The evidence presented from the tote bag coupled with evidence of defendant's fingerprints in the lab and his 3 a.m. arrival at the house also supports the challenged convictions.

The cumulative nature of the evidence, i.e., defendant's admitted use of methamphetamines, his personal possession of a usable amount of the drug, the contents of the open tote bag between defendant and Bryson, defendant's presence at the clandestine laboratory at 3 a.m., his fingerprints on numerous items in the laboratory, and the singular absence of Bryson's fingerprints in the laboratory, is more than sufficient evidence to support the reasonable inference that defendant was involved with others in the manufacture of methamphetamine at the residence of 1944 Jefferson Street where defendant was apprehended at 3 a.m. and to reject defendant's explanation of his presence at the Jefferson Street residence at 3 a.m.

It is also worthy to note that Detective Estes testified that it was common for a user of methamphetamine to support his habit by engaging in the manufacture and distribution of the substance.

Defendant asserts that *People* v. *Jenkins* (1979) 91 Cal.App.3d 579 [154 Cal.Rptr. 309], compels reversal of his conviction of counts I and II. We disagree. We find *Jenkins* to be factually distinguishable. There, the defendant was convicted of manufacturing PCP and of possessing piperidine and cyclohexanone with the intent to manufacture PCP; the sole evidence supporting his conviction was his fingerprints lifted from lab equipment and chemical containers located in defendant's brother's garage. The court found this evidence to be insufficient to support the convictions. As to the count involving possession with intent to manufacture, the court said "there is a limit to the mileage that can be obtained from the fingerprint evidence. The only fact directly inferable from the presence of the fingerprints is that sometime, somewhere defendant touched the containers. While given all the circumstances it was not unreasonable for the [trier of fact] to infer from the fingerprints that defendant was present in the garage when the piperidine-cyclohexanone compound was also there, more than mere presence must be shown in order to prove constructive possession: the People must also show that defendant had dominion and control over the contraband. [Citations.] [¶] The inference of dominion and control is easily made when the contraband is discovered in a place over which the defendant has general dominion and control: his residence [citation], his automobile [citation], or his personal effects [citation]. However, when the contraband is located at premises other than those of the defendant, dominion and control may not be inferred solely from the fact of defendant's presence, even where the evidence shows knowledge of the presence of the drug and of its narcotic character." (91 Cal.App.3d at p. 584; see also *People* v. *Johnson* (1984) 158 Cal.App.3d 850, 854-855 [204 Cal.Rptr. 877]; *Birt* v. *Superior Court* (1973) 34 Cal.App.3d 934, 937-938 [110 Cal.Rptr. 321]; *People* v. *Stanford* (1959) 176 Cal.App.2d 388, 391 [1 Cal.Rptr. 425]; *People* v. *Flores* (1943) 58 Cal.App.2d 764, 768-770 [137 P.2d 767].)

In this case, there was evidence from which the jury could draw reasonable inferences that defendant had dominion and control over the items seized in the house at 1944 Jefferson Street. That evidence consisted of the contents of the tote bag, including the damp filters, the large quantity of drugs, as well as the Vitablend bottles, all found on the seat of the car in an open bag beside defendant, and defendant's presence outside the lab at 3 a.m. Although Laurel McCartney, the neighbor at 1936 Jefferson Street, testified that he knew the house to have been occupied for the past three years by Robin Tinjaca and that he had never seen defendant, the jury could

nevertheless reasonably conclude from the totality of the evidence that defendant was involved in the manufacture of methamphetamine.

In *Jenkins,* there was a complete lack of other evidence such as presence in or outside the laboratory, or constructive possession of large amounts of the drug and damp filters indicating recent manufacture of the drug for sale.

We conclude that defendant's convictions for manufacturing methamphetamine and for possessing P-2-P and methylamine with the intent to manufacture methamphetamine (counts I and II) are supported by sufficient evidence and shall be affirmed.

II-IV*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed.

Marler, J., concurred.

**SIMS, J.**—I concur in the opinion of the court. I write separately simply to state that, in my view, substantial evidence supports defendant's convictions on counts I and II even upon the assumption the jury concluded defendant Bryson, and not defendant Small, "possessed" the tote bag.

The jury could reasonably conclude the coffee filters in the tote bag had been obtained directly from a methamphetamine manufacturing lab and not from an intermediary street dealer. The jury could furthermore conclude the coffee filters had been obtained not simply from *any* methamphetamine lab but were in fact obtained from the methamphetamine lab in front of which the automobile appeared at 3 a.m. In short, the jury could readily conclude Bryson had obtained methamphetamine and associated coffee filters from the lab in question and had appeared at the lab at 3 a.m. in order to transact some further business there.

Because the tote bag was open, and because the coffee filters emitted an unusual and strong order, the jury could also infer that defendant Small knew of the presence of methamphetamine (and coffee filters) in the tote bag and, hence, of defendant Bryson's intent to transact business at the lab. This is all the more so given the implausible nature of Small's excuse for being at the lab at 3 a.m. It is unusual for young men to visit young women, even for

---

*See footnote, *ante,* page 319.

sexual purposes, at 3 a.m., and no evidence, particularly including any testimony from the young woman in question, corroborated defendant Small's explanation of his presence.

From the totality of the foregoing circumstances, the jury could conclude both defendant Bryson and defendant Small knew of the presence of the methamphetamine lab and were on their way to it to transact business there. In these circumstances, the presence of defendant's fingerprints on manufacturing apparatus within the lab constitutes substantial evidence showing that defendant was actively involved in the manufacture of methamphetamine, including possessing chemicals necessary to the manufacture.

Appellant's petition for review by the Supreme Court was denied December 14, 1988.