Filed 1/21/14  P. v. Gonzalez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>RICARDO GONZALEZ et al.,<br><br>    Defendants and Appellants. | C068273<br><br>(Super. Ct. Nos. SF115347B,<br>SF115347C) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>DYDISE DEMUHL TAYLOR,<br><br>    Defendant and Appellant. | C069071<br><br>(Super. Ct. No. 115347A) |

1

Wearing masks and carrying weapons, Dydise Demuhl Taylor, his brother Larry Charles Brice, and Brice's acquaintance Ricardo Gonzalez, forced their way into the apartment of a young pregnant woman. She shared the apartment with another woman who was home with her new baby. Defendants demanded money, threatened to shoot the women, and pistol whipped one woman in the head. One of the victims was able to secretly call 911, and police apprehended defendants at the apartment a short time later.

Defendants were charged with first degree residential robbery in concert (Penal Code §§ 211, 213, subd. (a)(1)(A) [count one]; unless otherwise stated, statutory references that follow are to the Penal Code), first degree burglary (§§ 459, 460 [count two]), and false imprisonment by violence (§§ 236, 237 [count three]). Taylor and Brice were also charged with possession of a firearm by a person previously convicted of a felony. (Former § 12021, subd. (a)(1) [now § 29800, subd. (a)(1) (Stats. 2010, ch. 711, § 6)] [counts four and five, respectively].)

For the robbery offense, it was alleged that Taylor and Brice were personally armed with a firearm (§ 12022.53, subd. (b)) while Gonzalez was vicariously armed (§ 12022, subd. (a)). For the burglary offense, it was alleged the dwelling was occupied. (§ 667.5, subd. (c)(21).) It was further alleged that Taylor had two prior serious felony convictions. (§§ 667, subds. (b)-(i) and 1170.12.)

A jury convicted defendants of all charges and found the gun and occupied dwelling enhancement allegations true. In subsequent proceedings, the court found Taylor had two prior serious felony convictions within the meaning of the three strikes law and the five year enhancement provision. (§§ 667, subds. (b)-(i) and 1170.12; 667, subd. (a).) The court denied a motion under *People v. Romero* (1996) 13 Cal.4th 497, to strike one of Taylor's prior serious felonies.

The court sentenced Gonzalez to six years eight months in prison. The court imposed the middle term of six years for the robbery conviction, stayed the sentences on

the count one gun enhancement and the count two burglary conviction, and consecutively sentenced Gonzalez to eight months for the false imprisonment conviction.

Brice was sentenced to an aggregate term of 17 years four months, consisting of a six-year middle term on count one, a consecutive 10-year term for the gun enhancement, and consecutive one-third middle terms of eight months each for counts three and five. The court imposed and stayed the sentence on Brice's count two burglary conviction under section 654.

Taylor was sentenced as a third striker to 95 years to life. His sentence included 25 years to life on count one, plus a consecutive 10-year term for the firearm enhancement, and two consecutive five-year terms for the prior serious felony enhancements. The court imposed consecutive terms of 25 years to life for counts three and four. The court stayed the sentence on the count two burglary conviction under section 654.

All three defendants appealed. We consolidated the appeals for purposes of oral argument and disposition. Because we consolidated the separate appeals, we deny the People's request in *People v. Gonzalez* (case No. C068273) to take judicial notice of the record on appeal and the briefs in *People v. Taylor* (case No. C069071).

Defendant Gonzalez contends (1) insufficient evidence supports his count three false imprisonment conviction on an aiding and abetting theory, (2) even if sufficient evidence supports the false imprisonment conviction, the court should have stayed the sentence under section 654, (3) the judgment should be modified to strike rather than stay the count one gun enhancement, and (4) the abstract of judgment does not accurately reflect his presentence custody credits. We reject Gonzalez's first contention finding the record contains sufficient evidence to support Gonzalez's count three false imprisonment conviction on an aiding and abetting theory, but agree the sentence should be stayed under section 654. Given the stay of the count three sentence, we remand the matter for resentencing so the trial court may reconsider whether to impose or strike the one-year

3

gun enhancement on count one. We shall also order the abstract of judgment corrected to reflect one additional day of presentence custody credit for Gonzalez. In all other respects, we affirm the judgment as to Gonzalez.

Defendant Brice contends (1) the court erred in failing to stay the sentences on count three (false imprisonment) and count five (felon in possession of a firearm) under section 654, (2) the abstract of judgment erroneously states he was sentenced to the "upper term" on the count one robbery conviction, and (3) that he is entitled to an additional day of presentence custody credit. We agree the sentence on count three should be stayed, the abstract of judgment should be corrected to reflect a "middle term" of six years for the robbery offense, and that Brice is entitled to one additional day of custody credit, but otherwise affirm the judgment as to Brice.

We reach a different conclusion as to defendant Taylor. Taylor presents several claims of error but one is dispositive: the trial court erroneously denied Taylor's request to discharge his retained counsel prior to trial. This constitutional error compels reversal of his convictions.

FACTS AND PROCEEDINGS

We recount the facts in the light most favorable to the judgment in accord with established rules of appellate review. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) On July 14, 2010, Shanae Sahnhi lived in a two-story apartment in Stockton with her sister-in-law, Loretto Cebreros, and Cebreros's three week old daughter. Sahnhi was eight months pregnant. That morning, Cebreros cashed her tax return check for approximately $1,800, and she and Sahnhi, who had about $200, went shopping for baby clothes. Sahnhi purchased about $25 worth of clothes. Around 10:30 p.m., Sahnhi left the apartment to get medicine for Cebreros's baby. Upon returning a short time later, Sahnhi unlocked a security gate at the apartment complex's entrance and walked to the front door of her apartment.

4

Unbeknownst to Sahnhi, defendants followed her through the security gate and into the apartment complex. Brice was wearing gloves and a black hooded sweatshirt scrunched about his face. Taylor was wearing black clothing, a dark ski mask and gloves. Gonzalez wore an ace bandage over his face as a make-shift mask; he also had dark clothes and gloves. Brice and Taylor were both carrying guns.

Sahnhi opened her apartment door and as she turned to close it, Brice pushed the door open and shoved her into the apartment's downstairs bathroom. Brice pointed a silver semiautomatic gun at Sahnhi's stomach. Surprised and terrified, Sahnhi screamed. Defendants Taylor and Gonzalez followed Brice into the apartment and slammed the door. Sahnhi, however, was not immediately aware of their presence.

Brice demanded money from Sahnhi and she gave him approximately $175. Brice then yelled, " '[t]here has to be more.' " During trial it was suggested that perhaps someone had seen the women at the bank earlier that day cashing Cebreros's $1,800 tax return check, although Cebreros did not recall seeing anyone in particular.

Brice then ordered Sahnhi to lie down in the living room, which she did. Brice kept screaming, " 'Where's the money at?' " and pointed the gun at her. While lying on the living room floor, Sahnhi saw another man's feet near her and she heard a man with a Latino accent alert the others that someone else was upstairs. It was then that she realized three men were in her apartment.

The person upstairs was Cebreros. She had been in her bedroom with her baby when she heard Sahnhi scream. Cebreros stepped from her room and peered down the stairs. She saw a man coming upstairs towards her. Cebreros ran back to her room, closed the door and dialed 911. Police were immediately dispatched to the scene.

Defendants ultimately forced Sahnhi upstairs. Brice and Gonzalez went first. Sahnhi followed, with Taylor pointing a black semiautomatic gun in her back. Once upstairs, a man with a Latino accent instructed Cebreros to open the door, not to call

5

anyone and that everything would be okay. Cebreros, who was still connected with the emergency operator, hid her phone under a pillow on her bed.

Defendants pushed open the door and shoved Sahnhi into Cebreros's bedroom. Brice and Taylor followed Sahnhi into the room while Gonzalez remained close to the bedroom door. Brice and Taylor continued to demand money. Cebreros told defendants they did not have any money. Unsatisfied with the women's response, Taylor pistol whipped Sahnhi on the forehead. Sahnhi fell to the ground and began bleeding profusely. Taylor threatened to blow Sahnhi's head off if she did not give him the money. He began counting down from five. Before reaching zero, Cebreros told the men she had money in her purse. Taylor shoved Sahnhi into Cebreros's closet and ordered her to look for money. Either Brice, Taylor, or both also began looking through purses in Cebreros's closet; Gonzalez remained near the bedroom doorway repeatedly telling Brice and Taylor "[w]e gotta go," and to "hurry up." Cebreros told defendants her purse with the money was downstairs. At that point, all three defendants left the room and went downstairs. Sahnhi crawled from the closet, closed the bedroom door, and hid with Cebreros behind a dresser.

Once downstairs, one or more of the defendants opened the front door, looked out the windows, and saw police surrounding the apartment. A few minutes later, Taylor, Brice and Gonzalez surrendered; they opened the front door and crawled out of the apartment on their hands and knees. Defendants hid the ski mask, ace bandage, gloves, guns and ammunition throughout the downstairs of the apartment. Brice had $165 on him when taken into custody.

Defendants were tried jointly before a single jury. Evidence at trial included testimony from Sahnhi and Cebreros as well as prosecution witnesses who either heard Sahnhi scream or saw three men enter the apartment complex. Defendant Gonzalez testified on his own behalf, asserting he had been invited to the apartment and that he and his codefendants had done nothing wrong. Defendant Taylor also testified, claiming he

6

was looking for his brother Brice when he entered the apartment and that the police showed up a short time later.  He claimed none of the events described by Sahnhi and Cebreros occurred while he was in the apartment.  Brice did not testify.

The jury convicted defendants on all counts and found all enhancement allegations true.  All three defendants timely appealed.

DISCUSSION

I

Appeal of Defendant Gonzalez

A.      *Aiding and Abetting the False Imprisonment of Sahnhi*

During trial the prosecutor argued Taylor falsely imprisoned Sahnhi by shoving her into the closet in Cebreros's bedroom and that Gonzalez aided and abetted the crime by acting as a look-out.  On appeal, Gonzalez contends the record lacks sufficient evidence to support his conviction for false imprisonment on an aiding and abetting theory.  Gonzalez argues his mere presence in the bedroom is insufficient to show he knew Taylor intended to falsely imprison Sahnhi or that he encouraged or facilitated him in doing so.  We disagree with Gonzalez's view of the evidence and conclude substantial evidence supports Gonzalez's count three false imprisonment conviction on an aiding and abetting theory.

"The substantial evidence rule is generous to the respondent on appeal . . . ." (*People v. Small* (1988) 205 Cal.App.3d 319, 325.)  When determining whether there is substantial evidence to support a conviction, we view the record in the light most favorable to the People, resolving all conflicts in the evidence and drawing all reasonable inferences in support of the conviction.  (*People v. Campbell* (1994) 25 Cal.App.4th 402, 408 (*Campbell*).)  " 'We may conclude that there is no substantial evidence in support of

7

conviction only if it can be said that on the evidence presented no reasonable fact finder could find the defendant guilty on the theory presented.' " (*Ibid.*)

" 'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " (*Campbell, supra,* 25 Cal.App.4th at p. 409.) Although "neither presence at the scene of a crime nor knowledge of, but failure to prevent [a crime], is sufficient to establish aiding and abetting its commission," a court may consider presence at the scene, companionship, and conduct before and after the offense when determining whether a defendant is guilty of aiding and abetting the perpetrator. (*Ibid.*)

In this case, the record contains substantial evidence supporting Gonzalez's conviction. Gonzalez concedes, and the evidence shows, that he stood in the bedroom doorway when Taylor pushed Sahnhi into the closet. Based on this evidence the jury reasonably could have found, as the prosecutor argued, that Gonzalez was serving as a look-out when the false imprisonment occurred since Gonzalez could see whether anyone was coming up the stairs from the doorway. Acting as a look-out constitutes quintessential aiding and abetting behavior. (*Campbell, supra,* 25 Cal.App.4th at p. 409 [blocking one's view, diverting suspicion, and watching for others who might approach are textbook examples of aiding and abetting behavior]; *People v. Silva* (1956) 143 Cal.App.2d 162, 169.)

And, although denied at trial, Gonzalez also originally told police that his role was to be the look-out. As the jury was instructed, it could consider Gonzalez's prior statement to police of being the look-out when assessing Gonzalez's credibility as a witness and the veracity of his subsequent inconsistent trial testimony.

Gonzalez's act of blocking the only doorway out of Cebreros's bedroom further supports the inference that Gonzalez aided and abetted Taylor in falsely imprisoning

8

Sahnhi. Sahnhi testified that the closet door remained open after she was shoved inside. Had Gonzalez not stood in the bedroom doorway, Sahnhi may have had a means of escape. His actions undoubtedly helped Taylor keep Sahnhi in the closet against her will.

The jury, as the trier of fact, was also entitled to disbelieve the inference that Gonzalez's pleas of "[w]e gotta go" amounted to attempts to persuade his codefendants to stop. In addition to stating "we gotta go," Sahnhi also testified that Gonzalez told Brice and Taylor to "hurry up." Although Gonzalez failed to cite Sahnhi's "hurry up" testimony, a jury reasonably could have found that, when considered in context, the totality of Gonzalez's statements encouraged Taylor to carry out his criminal endeavors more expeditiously rather than cease them all together.

Aiding and abetting, moreover, may be committed "on the spur of the moment." (*People v. Eskew* (1962) 206 Cal.App.2d 205, 207.) A person may aid and abet a criminal offense without having agreed to do so prior to the act. (*People v. Durham* (1969) 70 Cal.2d 171, 181; *People v. Villa* (1957) 156 Cal.App.2d 128, 134.) Thus, it is not necessary that the perpetrator expressly communicate his criminal purpose to an abettor since that purpose may be apparent from the circumstances. (*People v. Butts* (1965) 236 Cal.App.2d 817, 836; *People v. Stadnick* (1962) 207 Cal.App.2d 767, 772 ["It need not be shown that the direct perpetrator of a crime expressly communicated his purpose to the accused in order to make the latter liable as an aider and abettor [citation]"].)

Given these concepts, the jury reasonably could have determined Gonzalez fully understood and had advance notice of Taylor's multiple criminal purposes that night, which were plainly evident from the surrounding circumstances. The men, all wearing dark clothing and gloves and covering their faces, followed Sahnhi into the apartment complex. Brice and Taylor were carrying guns. Brice shoved Sahnhi into the apartment and immediately into the downstairs bathroom. Gonzalez and Taylor followed, quickly slamming the apartment door and essentially trapping Sahnhi inside. Based on these

9

circumstances, Gonzalez's claim that he did not know Taylor intended to falsely imprison Sahnhi is meritless since the false imprisonment arguably began when defendants slammed the apartment door. That Gonzalez may not have precisely known Taylor intended to push Sahnhi into the closet does not mean he was unaware of the overarching intent to somehow restrain her against her will inside the apartment. (*People v. Reed* (2000) 78 Cal.App.4th 274, 280 ["It is the restraint of a person's *freedom of movement* that is at the heart of the offense of false imprisonment . . ."].)

Sahnhi also testified that a man with a Latino accent went upstairs and alerted the others that someone else was inside. Cebreros testified that a man with a Latino accent ordered her to open the bedroom door and told her not to call anyone. The jury was undoubtedly familiar with Gonzalez's voice because he testified in his own defense at trial. The prosecutor also played an audio recording of Gonzalez's statement to police after being taken into custody. After hearing Gonzalez testify and listening to the taped audio recording of his police interview, the jury, as the trier-of-fact, reasonably could have concluded that Gonzalez had a Latino accent. Based on this conclusion, the jury reasonably could have inferred that Gonzalez was the individual who went upstairs as a look-out, saw Cebreros and told Brice and Taylor that she was there. The jury also reasonably could have determined that Gonzalez tried to gain access to Cebreros's bedroom and warned her not to call anyone, impliedly including the police. This conduct shows Gonzalez was more than a passive bystander in the criminal acts taking place in the apartment, including when Sahnhi was pushed into the closet as Gonzalez blocked the bedroom door.

The evidence, when viewed in the light most favorable to the judgment, reasonably indicates that Gonzalez played an affirmative supportive role in falsely imprisoning Sahnhi in the closet of the upstairs bedroom and was not simply an unwitting bystander to the crime. His conviction for false imprisonment on an aiding and abetting theory was proper. Because we conclude sufficient evidence supports Gonzalez's false

10

imprisonment conviction as an aider and abettor, we need not address the People's argument that sufficient evidence supports Gonzalez's false imprisonment conviction based on Sahnhi's testimony that "they"--impliedly including Gonzalez--shoved her into the closet.

B.      *Section 654 Stay of the Count Three False Imprisonment Sentence*

The court sentenced Gonzalez to a consecutive eight month prison term on the count three false imprisonment conviction. Gonzalez contends section 654 mandates that the sentence be stayed because the false imprisonment was part of an indivisible course of conduct with the robbery and defendants' sole objective and intent during this course of conduct was to commit a robbery. The People argue shoving Sahnhi into the closet constituted a gratuitous act of violence against a helpless victim not subject to section 654's constraints on multiple punishments. We agree with Gonzalez that his sentence on count three should have been stayed under section 654 because shoving Sahnhi into the closet was not a gratuitously violent act but rather was a means to perpetrate the robbery.

Section 654 provides in pertinent part: "(a) An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute does not prohibit multiple convictions for the same conduct, only multiple punishments. (*People v. Monarrez* (1998) 66 Cal.App.4th 710, 713.) "In such a case, the proper procedure is to stay execution of sentence on one of the offenses." (*Ibid.*)

In any section 654 inquiry, the court must initially ascertain the defendant's objective and intent. (*People v. Porter* (1987) 194 Cal.App.3d 34, 38.) " 'If he entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of

11

an otherwise indivisible course of conduct.' " (*Ibid.*) "Whether the defendant maintained multiple criminal objectives is determined from all the circumstances and is primarily a question of fact for the trial court, whose finding will be upheld on appeal if there is any substantial evidence to support it." (*Ibid.*)

A "gratuitous" act of violence against a victim may be viewed as one so extreme that it is not incidental to a robbery for purposes of section 654. (See e.g., *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271-272 [gratuitous beating of a feeble, 66-year-old nonresistant robbery victim was not committed with the same objective as the robbery].) Examples of such gratuitous violence include where a robber falsely imprisons, assaults, or attempts to kill a victim *after* robbing him. (See e.g., *People v. Foster* (1988) 201 Cal.App.3d 20, 27 [false imprisonment of victims by locking them in store cooler occurred after robbers had obtained all of the money and therefore was not necessary or incidental to committing the robbery]; *People v. Nguyen* (1988) 204 Cal.App.3d 181, 185 [section 654 did not bar separate punishment for attempted murder committed following robbery]; *In re Jesse F.* (1982) 137 Cal.App.3d 164 [victim assaulted after robbery while attempting to escape]; *People v. Chapman* (1954) 43 Cal.2d 385, 387 [assault following robbery]; *People v. Williamson* (1979) 90 Cal.App.3d 164 [victims assaulted after money already taken and gun put away].)

According to the prosecutor, Sahnhi was falsely imprisoned when Taylor shoved her into the closet. Taylor, however, did so only when Cebreros admitted she had money in her purse after initially claiming she and Sahnhi had no money. Upon hearing Cebreros say she had money in her purse, Taylor pushed Sahnhi into the closet and ordered her to look through Cebreros's purses for money. Either he or Brice, or both, also got into the closet to find the money. Cebreros then clarified that the money--nearly $1,800--was actually in her purse downstairs. The defendants immediately left the room and went downstairs to locate the purse with the money. Thus, the evidence shows defendants had not completed the robbery when Taylor falsely imprisoned Sahnhi by

12

shoving her into the closet. On this record, we cannot say that pushing Sahnhi into the closet and ordering her to look through Cebreros's purses was a "gratuitous" act of violence. Instead, it was a means of facilitating the robbery defendants intended to commit.

That the robbery was ongoing when defendants falsely imprisoned Sahnhi distinguishes this case from those cited above. Because defendants had not fully robbed the victims of all their money when Taylor pushed Sahnhi into the closet, and since pushing her into the closet to look for a purse with money was not so extreme as to be incidental to the robbery, imposing a consecutive sentence for the false imprisonment is not factually supported by substantial evidence. Execution of Gonzalez's sentence on count three must be stayed under section 654.

C.      *Count One Gun Enhancement*

For purposes of the count one residential robbery in concert offense, the amended information alleged that Gonzalez was vicariously armed under the section 12022, subdivision (a) gun enhancement provision. The jury found the enhancement allegation true. At sentencing the People argued the one year gun enhancement should be imposed while Gonzalez urged the court to stay the enhancement. Based on the totality of the circumstances, including Gonzalez's age and his prior history, the court stayed the enhancement because it felt a total term of six years eight months was an appropriate sentence.

On appeal, Gonzalez contends the trial court procedurally erred in staying rather than striking the gun enhancement when imposing a sentence the court believed was just. (*People v. Haykel* (2002) 96 Cal.App.4th 146, 151; *People v. Eberhardt* (1986) 186 Cal.App.3d 1112, 1123 [trial court did not have power to "stay" imposition of sentence on the enhancement]; *People v. Jefferson* (2007) 154 Cal.App.4th 1381, 1388

13

[enhancement struck instead of stayed].)  Rather than remanding for resentencing, Gonzalez asks us to strike the enhancement.

From the record, it is clear the trial court exercised its sentencing discretion and decided six years eight months was an appropriate sentence for Gonzalez.  But the court's determination was based in part on its erroneous belief that the sentence on count three would be imposed and *executed* rather than imposed and *stayed* as we have ordered.  Given our conclusion that the sentence on count three must be stayed under section 654, we agree with the People that the matter must be remanded for resentencing.  Upon remand, the trial court may reconsider its treatment of the one year gun enhancement in light of the stay of the eight month sentence on count three.  (*People v. Haykel, supra,* 96 Cal.App.4th at p. 151.)

D.     *Presentence Custody Credits*

Gonzalez contends he is entitled to 307 days of custody credit rather than the 306 days reflected in the May 16, 2011, minute order and the abstract of judgment.  Because Gonzalez was arrested on July 14, 2010, rather than July 15, 2010, and sentenced on May 16, 2011, the People agree.  We accept the People's meritorious concession and shall order the May 16 minute order and abstract of judgment corrected to show 353 total days of presentence credit, consisting of 307 days of actual custody credit and 46 days of conduct credit.  (*People v. Smith* (1989) 211 Cal.App.3d 523, 525-527 [defendant entitled to credit from day of arrest to and including day of sentencing].)

II

Appeal of Defendant Brice

A.     *Section 654 Stay of the Count Three False Imprisonment Sentence*

Brice contends his sentence on count three must be stayed under section 654.  Like Gonzalez, Brice argues the act of shoving Sahnhi into the closet and ordering her to look

14

through Cebreros's purses for money merely facilitated the robbery and thus cannot be separately punished under section 654.  For the reasons stated above, we agree and shall order the sentence on Brice's false imprisonment conviction stayed pursuant to section 654.

B.      *Section 654 Stay of the Count Five Felon in Possession Sentence*

Brice also contends his sentence on count five for being a felon in possession of a firearm must be stayed under section 654 because he possessed the gun to carry out the robbery.  According to Brice, the act of possessing the firearm is indivisible from the robbery committed using the firearm and cannot be separately punished under section 654. We disagree and find the record contains substantial evidence that Brice harbored two separate intents to possess the firearm and commit the robbery, both of which are individually punishable.  (*People v. Porter, supra,* 194 Cal.App.3d at p. 38.)

Former section 12021 forbids a person convicted of a felony from possessing a firearm.  (Former § 12021, subd. (a)(1) [now § 29800, subd. (a)(1) (Stats. 2010, ch. 711, § 6].)  Whether a violation of former section 12021 " ' "constitutes a divisible transaction from the offense in which [a defendant] employs the weapon depends upon the facts and evidence of each individual case." ' " (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143 (*Jones I*).)

Where substantial evidence shows a felon possessed a firearm prior to committing a separate crime using that firearm, section 654 has been held not to bar punishments for both the felon in possession conviction and the primary crime of which the defendant is convicted.  (*Jones I*  at p. 1141 [defendant properly punished for being a felon in possession of a firearm and for shooting at an inhabited dwelling where only reasonable inference from evidence was that defendant possessed gun prior to shooting at house]; see also *People v. Jones* (2012) 54 Cal.4th 350, 363, fn. 3 (*Jones II*) [concurring opn., Werdegar, J.] [emphasizing that the Court was not calling the decision in *Jones I* into

15

doubt].)  This is so because "[w]hen an ex-felon commits a crime using a firearm, and arrives at the crime scene already in possession of the firearm, it may reasonably be inferred that the firearm possession is a separate and antecedent offense, carried out with an independent, distinct intent from the primary crime." (*Jones I* at p. 1141.)

By contrast, section 654 has been held to bar multiple punishments where the evidence shows a felon fortuitously came into possession of a firearm at the moment he committed a separate crime.  In *People v. Bradford* (1976) 17 Cal.3d 8, 22, the Supreme Court held section 654 prohibited separate punishments for assault with a deadly weapon upon a peace officer and possession of a firearm by an ex-felon where the defendant wrested away the officer's gun and shot at the officer after defendant was stopped for speeding.  The defendant's possession of the officer's revolver was not " ' antecedent and separate' " from his use of the gun in assaulting the officer. (*Ibid.*)  In *People v. Venegas* (1970) 10 Cal.App.3d 814, 820-821, the court held section 654 barred multiple punishments for assault with a deadly weapon and felon in possession of a firearm convictions where the evidence suggested the defendant obtained the gun during a struggle in a bar moments before the shooting occurred.

In this case, the record shows Brice committed two separate acts, each punishable under section 654:  arming himself with a firearm and robbing the victims.  Unlike in *Bradford* and *Venegas*, no evidence showed Brice fortuitously came into possession of the firearm at the time he committed the robbery.

Sahnhi testified that Brice already had the gun in his hands when he surprised her from behind and forced her into the apartment.  She also testified Brice's firearm did not belong to either her or Cebreros, and, prior to the incident, had never been in her home. Another witness testified that he observed two men, at least one of whom was black (Brice is African-American) sitting in a car for several hours before exiting the vehicle and following Sahnhi into the apartment complex.  A justifiable inference from this evidence is that Brice possessed the gun in the car while waiting for Sahnhi to return

16

home before robbing her. And when discussing applicable jury instructions on the felon in possession charge, the court asked Brice's counsel whether he intended to argue that Brice had simply found the gun and was trying to give it to the police. Brice's counsel responded, "I don't think there's any facts there that I can even remotely attempt to do that."

This case, then, is akin to *Jones I* where section 654 did not bar punishment for both crimes. (*Jones I, supra,* 103 Cal.App.4th at p. 1145 ["section 654 is inapplicable when the evidence shows that the defendant arrived at the scene of his or her primary crime already in possession of the firearm"].) " 'Commission of a crime under [former] section 12021 is complete once the intent to possess is perfected by possession. What the ex-felon does with the weapon later is another separate and distinct transaction undertaken with an additional intent which necessarily is something more than the mere intent to possess the proscribed weapon.' " (*Id.* at p. 1146.)

Brice's reliance on *People v. Jurado* (1972) 25 Cal.App.3d 1027, 1033 (*Jurado*), for the proposition that "a defendant may not be punished both for possession of a weapon and for another offense in which the weapon is used," is misplaced. There, the defendant, who was not a felon like Brice, was convicted of first degree burglary and carrying a concealed weapon. (*Id.* at p. 1029.) In finding the defendant could not be sentenced concurrently for both crimes, the court noted that the weapon defendant possessed in the burglary was the sole basis for elevating that offense to the first degree and thus the defendant had been severely punished for possessing the gun already. (*Id.* at p. 1033.) The court further noted that the record lacked any evidence showing defendant possessed the gun before the burglary. (*Ibid.*)

None of the facts which the court found compelling in *Jurado* are present here. The record contains sufficient evidence that Brice possessed the gun before robbing the victims. Furthermore, the robbery was elevated to first degree because Brice committed it in an inhabited dwelling and not because he used a weapon. (§§ 212.5, subd. (a), 213,

subd. (a)(1)(A).)  We also note that *Jurado* did not consider former section 12021, but instead addressed section 654's application to other weapons charges such as carrying a concealed weapon under section 12025.  Cases are not authority for propositions not considered.  (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 620.)

A violation of former section 12021 differs from other weapons charges.  (*People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1409-1410.)  Non-felons can be charged with other firearms violations but not with a violation of former section 12021.  Thus, former section 12021 raises unique policy considerations not present with other firearms violations.  (*Jones I, supra,* 103 Cal.App.4th at p. 1145 ["The Legislature clearly intended, in enacting section 12021, to minimize the danger to public safety arising from free access to firearms, a danger presumed to be greater when the person possessing the concealable firearm is an ex-felon"].)  But even if *Jurado's* reasoning could apply to former section 12021 we respectfully decline to follow it.  (See *Jones I* at p. 1149, fn.4 [disagreeing with *Jurado*]; *Jones II, supra,* 54 Cal.4th at p. 363, fn.3 [concurring opinion stating the Supreme Court did not intend to cast doubt on *Jones I*].)

Punishing defendant for possessing the firearm as a felon and for later robbing Sahnhi and Cebreros was commensurate with his culpability even if the offenses occurred relatively close in time.  Brice was properly sentenced for both crimes.

C.    *Middle Term for the Count One Residential Robbery in Concert Offense*

Section 213 proscribes the punishment for robbery in concert with two or more persons as imprisonment in the state prison for either three, six, or nine years.  (§ 213, subd. (a)(1)(A).)  The court sentenced Brice to the midterm of six years on the count one robbery in concert conviction.  The abstract of judgment, however, erroneously recites that six years constitutes the "upper term" on count one.  We shall order the trial court to correct the clerical error in the abstract of judgment to show Brice was sentenced to the "middle term" of six years for the robbery in concert offense.  (*People v. Mitchell* (2001)

18

26 Cal.4th 181, 185 [appellate court has the inherent power to correct clerical errors in an abstract of judgment that does not accurately reflect the oral pronouncement of judgments of sentencing courts].)

## D.    *Presentence Custody Credits*

Brice contends he is entitled to 314 days of presentence custody credit rather than the 313 days listed on the abstract of judgment because the record shows he was arrested on July 14, 2010, and was sentenced on May 23, 2011.  The People agree.  We accept the People's concession and order the abstract of judgment amended to show 361 total days of presentence credit, consisting of 314 days of actual custody credit and 47 days of conduct credit.  (*People v. Smith, supra,* 211 Cal.App.3d at pp. 525-527.)

III

Appeal of Defendant Taylor

Defendant Taylor raises four claims in his appeal, two focusing on the propriety under section 654 of imposing consecutive sentences for his convictions for false imprisonment and being a felon in possession of a firearm, one for the trial court's refusal to strike at least one of his two previous strike convictions, and one for the trial court's denial of his request to dismiss his counsel, Mr. Platt, prior to trial.  This latter contention is dispositive.

We agree with Taylor that his constitutional right to counsel was violated when the court erroneously applied the stricter *Marsden* standard for dismissing appointed counsel in denying Taylor's request to discharge his retained attorney.  (See *People v. Marsden* (1970) 2 Cal.3d 118, 124-125 (*Marsden*); *People v. Ortiz* (1990) 51 Cal.3d 975, 987 (*Ortiz*) [trial court erred in requiring defendant to demonstrate incompetence of his retained counsel before allowing him to discharge attorney].)  His convictions must therefore be reversed.  (*Ortiz* at p. 988 [a criminal defendant need not demonstrate

19

prejudice resulting from a violation of the constitutional right to counsel to have his conviction reversed].)

The day jury selection was scheduled to begin Mr. Platt informed the court that an issue had arisen between he and Taylor and that Taylor refused to talk to him. Mr. Platt said that Taylor, "want[ed] a Marsden." After listening to Mr. Platt briefly describe the conflict, the court responded, "a Marsden motion might be appropriate at this point." The court cleared the prosecutor and codefendants from the courtroom to conduct what it considered to be a *Marsden* hearing. The sealed transcript of the hearing is labeled "*Marsden Hearing*."

During the closed hearing, Taylor stated he was "tryin' to relieve [his] counsel." The court informed Taylor that "If you want to relieve your counsel because you believe he has either (a) done something that he shouldn't have or (b) failed to do something that he should have, then we can discuss that as a Marden [*sic*] motion." Taylor responded, "[i]f that's what is needed." After listening to Taylor's complaints against Mr. Platt, which included not filing a writ petition to challenge an adverse ruling the court made the previous day and not filing a motion to "bring up past evidence," the court denied Taylor's purported *Marsden* motion, finding no basis to relieve trial court at that juncture.

As Taylor contends, the trial court here held what was in essence a *Marsden* hearing to determine whether to permit Taylor to discharge Mr. Platt. The legal principles governing a *Marsden* hearing are well settled. A defendant seeking to discharge his appointed counsel " ' "is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations]." ' " (*People v. Lara* (2001) 86 Cal.App.4th 139, 150 (*Lara*).) What is equally well settled is that the standards governing a defendant's right to discharge *appointed* counsel do not apply where counsel is *retained*. (*Ortiz, supra,* 51 Cal.3d at pp. 983-984.)

20

A criminal defendant's right to discharge his retained attorney, with or without cause, has long been recognized in this state. (*Lara, supra,* 86 Cal.App.4th at p. 152.) Indeed, a defendant's interest in discharging a retained attorney is included within the constitutional right to counsel of one's choice. (*Ibid.*) The right to discharge retained counsel is not absolute, however. (*Id.* at p. 153.) A trial court may exercise its discretion to deny such a request where the discharge would significantly prejudice the defendant by forcing him to trial without adequate representation or if the request was untimely and would unreasonably disrupt the orderly processes of justice under the circumstances of a particular case. (*Ortiz, supra,* 51 Cal.3d at p. 982.)

With these standards in mind, it is apparent from the record that a *Marsden* hearing was not appropriate to evaluate Taylor's request to discharge Mr. Platt. Based on purportedly ambiguous clerk's minutes, the People argue it is unclear whether Mr. Platt was appointed or retained and thus we should reject Taylor's contention on appeal. Yet, the transcript of a later hearing to relieve Mr. Platt after the jury convicted Taylor but before he was sentenced resolves any purported ambiguity regarding Mr. Platt's status as a retained attorney before and during trial. At that hearing, Mr. Platt conceded he had been retained by Taylor, and that Taylor had the right to discharge him at any time. Mr. Platt also conceded, and the court agreed, that the issue of whether Taylor could dismiss him prior to trial was "technically not a Marsden" because he was not appointed.

Thus, we deny as irrelevant the People's request to take judicial notice of various San Joaquin County documents relating to the Lawyer Referral Service for the provision of court-assigned counsel since we find Mr. Platt was retained.

The record, then, unambiguously demonstrates that Mr. Platt was retained and not appointed when the trial court conducted the *Marsden* hearing. Applying the stricter *Marsden* standard for dismissing appointed counsel therefore denied Taylor of his constitutional right to counsel. (*Ortiz, supra,* 51 Cal.3d at p. 988.) The right to counsel of choice is so basic a right to a fair trial that its infraction can never be treated as

21

harmless error. (*Ibid.* ["a criminal defendant need not demonstrate prejudice resulting from a violation of [the right to counsel] in order to have his conviction reversed"].)

In finding the error reversible, we reject the People's alternative argument that even if Mr. Platt was retained the trial court had discretion to deny the motion as untimely because Taylor raised the issue the day jury selection was set to begin. Although a motion to discharge retained counsel may be denied as untimely (*Ortiz, supra,* 51 Cal.3d at p. 982), nothing in this record shows the trial court made any such finding. Instead, the trial court denied the supposed *Marsden* motion on the merits and made no findings as to timeliness.

The absence of an untimeliness finding means there is no way to determine whether allowing Taylor to discharge his retained counsel and granting a continuance would have prejudiced the prosecution and disrupted the orderly process of justice. (*Lara, supra,* 86 Cal.App.4th at pp. 163-164 [erroneous application of *Marsden* standard to retained counsel required reversal because appellate court could not conclude the motion was necessarily untimely based on incomplete record]; compare *People v. Lau* (1986) 177 Cal.App.3d 473, 477, fn.3 [citing trial court's comments regarding concerns over timeliness as support for upholding trial court's decision to deny motion].)

Here, all three defendants entered general time waivers and the trial had already been continued several times. A reasonable inference from these facts is that an additional continuance was unlikely to disrupt the orderly process of justice. And, perhaps most telling, is that the prosecutor never objected to the supposed *Marsden* motion as being untimely. By contrast, at the later hearing to relieve Mr. Platt prior to the pronouncement of judgment, the prosecutor objected that the latter motion was untimely and merely constituted a delay tactic.

Like in *Lara*, we are left with an incomplete record upon which to conclude that Taylor's motion to discharge Mr. Platt was necessarily untimely. Reversal is therefore mandated.

22

DISPOSITION

The judgment as to Gonzalez is modified to stay the consecutive sentence on count three. The trial court is directed to amend the abstract of judgment accordingly. In light of the count three stay, the matter is remanded for resentencing so the trial court may reconsider whether to impose or strike the count one gun enhancement. The trial court is also directed to amend the abstract of judgment as well as the May 16, 2011, minute order for the sentencing hearing to show Gonzalez is entitled to one additional day of presentence custody credit for a total of 353 days of credit. The trial court is directed to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

The judgment as to Brice is modified to stay the consecutive sentence on the count three false imprisonment conviction and to give Brice credit for one additional day of presentence custody, for a total of 361 days of presentence custody credit. The trial court is directed to amend Brice's abstract of judgment accordingly and also to correct the abstract of judgment to reflect that Brice was sentenced to the "middle term" of six years on the count one robbery in concert conviction rather than the "upper term." The trial court shall forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

The judgment as to Taylor is reversed.


      HULL      , J.

We concur:


      NICHOLSON      , Acting P. J.


      DUARTE      , J.

23